**UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA**

---

Larry D. Prantner,

               Plaintiff,        Civ. No. 10-4157 (RHK/JJK)
                                        **MEMORANDUM OPINION
                                        AND ORDER**

v.

United States of America and
Richard D. Schmidt, M.D.,

               Defendants.

---

Reid G. Rischmiller, Rischmiller & Knippel LLP, Minneapolis, Minnesota, for Plaintiff.

Mark W. Hardy, David C. Hutchinson, Geraghty O'Loughlin & Kenney, P.A., St. Paul, Minnesota for Defendant Richard D. Schmidt, M.D.

---

**INTRODUCTION**

This action arises out health-care services received by Plaintiff Larry Prantner at the Veterans Administration Medical Center in Minneapolis, Minnesota (the "VAMC"). As a result of alleged negligence of Defendant Richard D. Schmidt, M.D., the VAMC's Chief of Orthopedic Surgery, Prantner alleges that his left foot became infected, ultimately resulting in a below-the-knee amputation. Presently before the Court is Dr. Schmidt's Motion for Summary Judgment. For the reasons that follow, his Motion will be denied.

## BACKGROUND

The key facts are undisputed.[1] In April 2007, Prantner underwent a left total hip arthroplasty (hip replacement) at the VAMC. He suffered several post-surgery complications, including a gastrointestinal bleed, an arterial thrombus (blood clot) in his lower left leg, and a hematoma (pool of blood) pressing on his left sciatic nerve. As a result, he spent more than three months in the VAMC's "extended care center" ("ECC"), where he received care from several doctors. During much of that time, he had little to no feeling in his lower left leg.

At some point following surgery, Prantner developed a pressure ulcer on his left heel, although the precise onset date is unclear from the record. A pressure ulcer is "an area of skin that breaks down when something keeps rubbing or pressing against [it]." http://www.nlm.nih.gov/medlineplus/ency/article/007071.htm (last visited June 5, 2012). He received ongoing treatment for the ulcer over the ensuing months, both before and after his July 19, 2007, discharge from the VAMC, and while its appearance changed over time, it did not heal.

Medical records generally show that Prantner's CRP level[2] was on a steady increase through the summer and early fall of 2007. A progress note dated July 2, 2007,

---

[1] The Court notes, however, that the parties have submitted only snippets from Prantner's medical records, which has made it difficult to reconstruct precisely what occurred. Moreover, the parties' briefs lay out certain "facts" that are not referenced in the documents in the record. Nevertheless, it does not appear that any of those "facts" are in dispute.

[2] CRP stands for "C-reactive protein," which is produced by the liver and "rises when there is inflammation throughout the body." http://www.nlm.nih.gov/medlineplus/ency/article/

by Jeremy Gardner, M.D., an orthopedic resident[3] who saw Prantner that day, indicated that his CRP level was "still elevated at 10.3." The level increased to 12.43 on July 18, 2007, and then rose significantly to 56.42 on August 29, 2007.[4]

Prantner returned to the VAMC for a follow-up visit on October 3, 2007, once again seeing Dr. Gardner, whose two progress notes from that visit are at the heart of the instant Motion. The first note was entered into the VAMC's electronic medical records system at 2:09 p.m. on October 3. It directed the reader to "see [the] dictated note," referring to the second (and longer) note from that same date. The note also provided: "The patient's history, findings, assessment and plan were discussed with Dr. Schmidt, who agrees with the plan." It is undisputed that a conversation between Doctors Gardner and Schmidt did in fact occur, and it is apparently undisputed that the conversation took place around the same time the note was created.

The second note was dictated by Dr. Gardner six minutes later, at 2:15 p.m.[5] It spanned more than two pages, recounting at length Prantner's surgery, post-surgical

---

003356.htm (last visited June 5, 2012). Dr. Schmidt testified in his deposition that "an increasing value in [CRP level] would suggest that there is an infection going on somewhere." According to Prantner (and apparently undisputed), a "normal" CRP level is between 0 and 5.

[3] A resident has earned a medical degree and practices medicine under the supervision and guidance of a fully licensed physician while learning a particular medical specialty, such as orthopedics. See http://en.wikipedia.org/wiki/Residency_(medicine) (last visited June 5, 2012). Here, Dr. Gardner was supervised by Dr. Schmidt, the VAMC's Chief of Orthopedic Surgery.

[4] While not a focus of the instant Motion, Prantner's "ESR level" or "sedimentation rate" – another indicator of infection – also was increasing throughout the summer and early fall.

[5] Although dictated at 2:15 p.m. on October 3, 2007, the note was not (1) transcribed until the following day, (2) entered into the VAMC's electronic medical records until October 5, 2007, and (3) electronically signed by Dr. Gardner until October 9, 2007.

complications, and follow-up care. It recorded Dr. Gardner's observations that the ulcer on Prantner's left heel was "persistent" and "ha[d] not decreased in size; however, the depth of his ulcer[] decreased over the last five months with some improvement in healing." It also provided the ulcer was then "approximately 2 x 2 cm and 3 to 3 [*sic*] mm in depth." The skin surrounding the ulcer was not red, no cellulitis (inflammation of the top skin layers) was noted, and there was a "small amount of granulation tissue at the base of the wound."[6] The last two lines of the progress note, which were in its "Plan" section, are critical here: "Patient will follow up with Orthopedics in two to three months with repeat labs to assess his progress. *His current CRP is increased from 56 on 8/29/07 to 165 on 10/3/07.*" (emphasis added).

Dr. Schmidt testified in his deposition that 165 is an "extremely high" CRP level and signified that Prantner had an infection somewhere in his body. He also testified that this "significantly abnormal" lab value required that some action be taken to treat the infection. No action was taken, however.

Instead, Prantner presented at the VAMC Emergency Room approximately three weeks later, on October 21, 2007, complaining of bloody discharge and drainage from the ulcer. His daughter, who had accompanied him, also advised that Prantner "had been acting more confused the past three days." The ER physician observed that the ulcer had a "spongy necrotic" base and was "foul smelling."[7] The assessment was "cellulitis and

---

[6] "Granulation tissue" forms when a wound is healing. See http://compepid.tuskegee.edu/syllabi/pathobiology/pathology/genpath/chapter9.html (last visited June 5, 2012).

[7] "Necrotic" refers to dead tissue. See http://www.nlm.nih.gov/medlineplus/ency/article/

- 4 -

possible osteo[myelitis]" – infection of the bone – "of the left heel." Despite the administration of intravenous antibiotics, the heel turned gangrenous the following day and, ultimately, Prantner's left leg was amputated below the knee to ward off systemic (and possibly fatal) infection.

After exhausting administrative remedies, Prantner commenced this action against the United States on October 5, 2010, alleging that he had received negligent care at the VAMC, resulting in the loss of his lower left leg; he sought $5 million in damages. After discovery revealed that Dr. Schmidt was not an employee of the United States but rather an independent contractor, Prantner filed an Amended Complaint (Doc. No. 24) adding Dr. Schmidt as a Defendant and lowering his *ad damnum* to $3 million. With discovery complete, Dr. Schmidt now moves for summary judgment. The Court held a hearing on the Motion on May 29, 2012, and it is now ripe for disposition.

## STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. Id. at 322; Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party.

---

002266.htm (last visited June 5, 2012). Necrosis occurs when "there is not enough blood flowing to the tissue" and is "not reversible." Id. "When substantial areas of tissue die due to a lack of blood supply, the condition is called gangrene." Id.

Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007).  The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528 F.3d 1074, 1078-79 (8th Cir. 2008).

## ANALYSIS

All parties agree that Prantner's negligence claim against Dr. Schmidt is governed by Minnesota law.  "In order to make out a prima facie case of medical malpractice for negligent treatment, a plaintiff must show (1) the standard of care recognized by the medical community as applicable to the particular defendant's conduct; (2) that the defendant departed from that standard; . . . (3) that the defendant's departure from that standard was a direct cause of [the plaintiff's] injuries; and (4) damages."  Knuth v. Emergency Care Consultants, P.A., 644 N.W.2d 106, 111 (Minn. Ct. App. 2002) (quoting Reinhardt v. Colton, 337 N.W.2d 88, 94 (Minn. 1983)).  "Expert testimony is required to establish the standard of care, the defendant's departure from that standard, and causation."  Id. (internal quotation marks and citation omitted).

The instant Motion hones in on the second element:  Dr. Schmidt's alleged deviation from the appropriate standard of care.  Prantner has proffered opinions from two medical doctors (Joseph Teynor, M.D., an orthopedic surgeon, and David Fisk, M.D., a wound-care expert) indicating that the appropriate standard of care required intervention and treatment of the infected ulcer on October 3, 2007, when blood tests

revealed Prantner's CRP level was 165. Notably, Dr. Schmidt does not quarrel with that assertion, having acknowledged the same in his deposition. Rather, he argues there is no evidence in the record from which a jury could conclude that he was *aware* Prantner's CRP was (in his words) "significantly abnormal" on October 3, 2007. In the absence of such evidence, he contends Prantner cannot establish his negligence. (See, e.g., Def. Mem. at 9 ("There is not sufficient evidence to create a genuine issue . . . whether Dr. Schmidt was informed about, and therefore failed to respond to, laboratory testing results indicating elevated CRP levels on October 3, 2007.").) The Court does not agree.[8]

It is true that neither Dr. Schmidt nor Dr. Gardner, in their depositions, could recall having spoken about Prantner's CRP level on the date in question. This is perhaps not surprising, as the events giving rise to this case happened more than four years ago. But these failures tell only part of the story.

While Prantner lacks any *direct* evidence that Dr. Schmidt was aware of his CRP level on the date in question, he may – and does – rely on *inferences* that can be drawn from the evidence tending to show such awareness. See, e.g., Desert Palace, Inc. v. Costa, 539 U.S. 90, 100 (2003) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence."); Do v. Wal-Mart Stores, 162 F.3d 1010, 1013 (8th Cir. 1998) (*per curiam*) ("[T]he nonmoving party may draw upon favorable inferences from circumstance evidence to defeat summary

---

[8] At oral argument, Prantner's counsel suggested that Dr. Schmidt had deviated from the standard of care in another way: failing to appreciate the rise over time in Prantner's CRP level. For the reasons stated herein, the Court need not, and does not, reach that issue, as Prantner survives summary judgment without this alternative basis for liability.

judgment."). In particular, he points to evidence from which he claims it can be inferred that (1) Dr. Gardner was aware of Prantner's lab values before he spoke to Dr. Schmidt and (2) Dr. Gardner conveyed those lab values in the subsequent conversation. The Court agrees that the record reasonably can be read to sustain these inferences, which compels the denial of summary judgment.

Regarding Dr. Gardner's awareness of the elevated CRP, Prantner notes that the results of his blood work, including his CRP level, were added to his electronic medical records at 11:09 a.m. on October 3 – that is, three hours *prior* to Dr. Gardner entering the first progress note. Second, and more importantly, Dr. Gardner testified in his deposition that the timing of the progress notes suggests he was aware of the CRP level when he spoke with Dr. Schmidt:

> Q: You don't recall whether you specifically knew of the 165 CRP value when you were discussing the plan with Dr. Schmidt. Is that true?
>
> A: Well, I mean I would -- I don't recall those values, so I don't --
>
> Q: Okay.
>
> A: -- necessarily remember having that information, *but the timing suggests that I would have that information*.
>
> Q: That you would or would not?
>
> A: I mean[,] *the note is dictated afterwards, so it suggests that I would have that information I think*.

The record is in accord. At 2:09 p.m. on October 3, 2007, Dr. Gardner entered a progress note indicating that he had spoken with Dr. Schmidt. Six minutes later, he finished dictating a very lengthy note documenting Prantner's history, assessment, and plan,

- 8 -

including the elevated CRP level. Although it is possible that Dr. Gardner learned of the CRP results in this short six-minute window, in the Court's view it is far more reasonable to conclude that he was aware of it earlier. In other words, there is evidence in the record to support Prantner's argument that Dr. Gardner knew of the CRP level before speaking with Dr. Schmidt (and entering the first progress note).

Similarly, there exists evidence in the record from which a jury could find that Dr. Gardner actually conveyed this information to Dr. Schmidt. Indeed, the first note prepared by Dr. Gardner on October 3 provided that he had "discussed with Dr. Schmidt" Prantner's "history, findings, assessment and plan." Notably, the elevated CRP level is found in the "plan" section of Dr. Gardner's second progress note. Further, the word "findings" in the first note could be interpreted to include the results of Prantner's blood work.[9] In addition, Dr. Gardener testified that, "as a third-year resident[,] I would relay as much and all information that I could" to his supervising physician (Dr. Schmidt), including lab values of which he was aware. Dr. Schmidt, too, acknowledged in his deposition that a third-year resident would be expected to inform his supervisor of a "significantly abnormal" CRP level.

---

[9] Dr. Schmidt argues that the first note – mentioning Prantner's "history, findings, assessment and plan" – is of no evidentiary value because it was "clearly created by electronic template within the electronic medical records, as the precise language of the note is duplicated numerous times within Mr. Prantner's electronic medical records." (Def. Mem. at 3.) There is no reason to assume, however, that the note did not accurately summarize the conversation between Drs. Schmidt and Gardener, even if it had been prepared by "template." Moreover, at this juncture the Court must construe all evidence in the light most favorable to Prantner. In the Court's view, the note reasonably could be read to suggest that the doctors did, in fact, discuss Prantner's lab results on the day in question.

To be clear, this is not to say that the evidence *conclusively demonstrates* that Dr. Schmidt was aware of Prantner's CRP value on October 3, 2007.  Nor is the Court expressing any opinion on Prantner's likelihood of success at trial or his ability to survive a motion for judgment as a matter of law after the presentation of his case.  Rather, the Court only determines, at this juncture, that he has proffered sufficient evidence from which a jury *could* find that Dr. Gardner was aware of his lab values before speaking to Dr. Schmidt and then conveyed those lab values in the subsequent conversation.  In other words, there is "sufficient evidence from which a reasonable jury could find in [Prantner's] favor on all elements of his claim[]."  Johnson v. Hamilton, 452 F.3d 967, 972 (8th Cir. 2006).  Summary judgment, therefore, must be denied.  Porous Media Corp. v. Pall Corp., 110 F.3d 1329, 1338 (8th Cir. 1997) ("[J]udgment as a matter of law is appropriate only when all of the evidence points one way and is susceptible of *no reasonable inference* sustaining the position of the nonmoving party.") (emphasis added) (internal quotation marks and citation omitted).

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Dr. Schmidt's Motion for Summary Judgment (Doc. No. 60) is **DENIED**.

Date:  June 7, 2012                                         s/ Richard H. Kyle
                                                            RICHARD H. KYLE
                                                            United States District Judge